IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                          No. 15-CR-4082 MCA

DAVON LYMON,

    Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on the *United States' Motion to Unseal Audio-Visual Trial Exhibits Previously Sealed by October 27, 2016 Sealing Order (Doc. 118)*. [Doc. 120] The Court has considered the motions and the relevant law, and has been otherwise fully advised in the premises. The Court considers here the sole issue properly before it: "unsealing" trial Exhibits 12,13,14 and 42 (audio-visual evidence), or protection of that information via a confidentiality or protective order. The trial on Counts I, II and III of the *Superseding Indictment* remains pending.

**BACKGROUND**

In this case, Defendant was charged by a single indictment with four separate firearm counts. [Doc. 14; Doc. 72] The first three counts concern possession of two different firearms in May of 2015. The fourth count concerned possession of a firearm on or about October 21, 2015. With regard to Count IV, the Government relied on the theory that Defendant possessed the firearm when he used it on October 21, 2015 to shoot Albuquerque Police Officer Daniel Webster, who subsequently died of his injuries.

1

During the course of this litigation, the Court granted Defendant's Unopposed Motion to sever Count IV from Counts I-III for purposes of trial. The Court took evidence at a bench trial on Count IV on October 24, 2016 and October 25, 2016, and convicted Defendant of Count IV on October 28, 2016. [Doc. 119] The Court subsequently returned trial exhibits to the parties per Local Rule of Criminal Procedure 55.1. [Doc. 128]

The federal trial of Counts I through III is set for January 3, 2017 before a jury. [Doc. 122] While evidence concerning the shooting of Officer Webster was admitted without objection at the trial of Count IV, the Court, on November 4, 2016, orally granted *Defendant's Motion in Limine* to exclude the audio-visual evidence, without objection by the Government, from consideration at the trial on Counts I through III.

After the parties rested at the bench trial of Count IV, the Government orally moved to seal the audio-visual exhibits. The motion pertained to Trial Exhibits 12, 13, 14 and 42, each of which was admitted at trial without objection or limitation or restriction. Defendant did not oppose the motion, and the parties submitted an *Order Sealing Audio-Visual Exhibits*, which the Court entered on October 27, 2016. [Doc. 118] The Order stated that disclosure of the audio-visual exhibits, two of which capture the shooting of Officer Webster, "will likely interfere with Defendant's ability to receive a fair trial in a forthcoming state prosecution involving largely the same subject matter that this Court is considering in Count 4 of the above captioned motion." [Doc. 118]

On October 31, 2016, the Government filed the *United States' Motion to Unseal Audio Visual Trial Exhibits Previously Sealed by October 27, 2016 Sealing Order (Doc. 118)*. [Doc. 120]  Therein, the Government states:

> 4.     Upon reflection, the United States recognizes that its oral motion was overbroad in that it sought relief to which the United States was not entitled.  The United States believes that there was a valid federal interest to be served by sealing the audio-visual exhibits, which were already part of the public record, until the Court rendered it[s] verdict.  However, it cannot identify any legally supportable federal interest served by maintaining public record information under seal to safeguard State proceedings that have yet to be initiated.
>
> 5.     Also on further reflection, the United States now recognizes that it lacked standing to request that the audio-visual exhibits be sealed to protect any related-State (*sic*) proceedings that may be initiated in the future.  The United States respectfully submits that the interests implicated by this matter are those of the Defendant and the State, which is not a party to this case.

[Doc. 120]  According to the Motion, the Defendant took no position on this motion. [Doc. 120, ¶ 6]  The Court set the motion for a hearing on November 4, 2016.  [Doc. 121]

After the Government filed its motion on October 31st, the New Mexico Attorney General filed a criminal complaint against Defendant on state charges, including murder charges.  On November 3, 2016, the New Mexico State District Court (Second Judicial District) entered a Protective Order relating to disclosure all audio and visual evidence that is produced by the state in discovery in the state case.  On November 3rd, 2016, two local news organizations (the News Organizations) and Officer Webster's widow, Michelle Carlino-Webster, moved to intervene in this matter (limited intervenors).  [Doc. 123; Doc. 127]  The Court granted their respective motions to intervene for the limited purpose of articulating their positions on disclosure at the November 4, 2016 hearing.

[Doc. 124; Doc. 129]  The News Organizations seek to have the audio/visual exhibits unsealed.  [Doc. 123]  Mrs. Carlino-Webster opposes the Government's motion to unseal the exhibits.  [Doc. 127]

At the hearing on November 4, 2016, the Government, through counsel, changed its position on the relief it sought several times.  It ultimately supported sealing of the exhibits for a limited period of time until Defendant is arraigned on the State charges.  Government counsel projected the arraignment to occur on December 5, 2016.  Also on November 4th, Defendant changed his position of "taking no position" on the motion to unseal and argued, through counsel, that, both with regard to the state trial and the remaining federal charges, dissemination of the exhibits would prejudice Defendant's Sixth Amendment right to a fair trial.  Finally, and somewhat unexpectedly, on the afternoon of November 5, 2016, the United States Attorney submitted a letter to the Court with copies to the parties and the limited intervenors, therein stating that his office now supports the immediate unsealing of the exhibits, in whole or in part.  Mrs. Carlino-Webster, through counsel, submitted a response to the U.S. Attorney's letter on that same day.

The Court has carefully considered the arguments of the parties and limited intervenors made in their respective pleadings and at the hearing held on November 4th.

**ANALYSIS**

It is important to properly set forth the issues before the Court as articulated by the parties and the limited intervenors.  What are the common-law rights, if any, of the parties and intervenors to keep exhibits under seal or confidential under a

confidentiality/protective order when the exhibits have been used in open court?  Do the press and public's common-law or First Amendment right to possess, disseminate, and reproduce the evidence outweigh Defendant's interest in a fair and impartial jury and/or the Webster family's privacy interests?

To be sure, what is not at issue here is the right to an open trial.  Defendant's trial on Count IV was conducted in open court with free access to the press and public.  All exhibits were handled in the usual course of business, and the audio-visual exhibits were displayed on monitors throughout the courtroom. The trial drew considerable press coverage.   There can be no question that the trial was open, the press attended, and the press had an opportunity to report on what it observed.  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 610 (1978) ("The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed.").  The media's attempt, during oral argument on November 4th, to characterize the trial proceeding as "secret" is refuted by the record.

Additionally, no party has brought a proceeding pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, or a "reverse FOIA proceeding" (through the Administrative Procedures Act) to enforce the confidentiality of any of the exhibits.  *See Campaign for Family Farms v. Glickman*, 200 F.3d 1180, 1184 (8th Cir. 2000).  The State Court's Protective Order entered November 3, 2016, *State of New Mexico v. Davon Lymon*, CS 2016-0012, has been made a part of the record in this case, without objection. Lastly, pursuant to Local Rule of Criminal Procedure 55.1 all trial exhibits were returned to the parties.  Per Rule 55.1, the parties must maintain those exhibits and produce them

for the appellate court should there be an appeal in this case. The time for appeal of the Court's adjudication of Count IV has not run.

**COMMON LAW INTERESTS**

> *Nixon* discusses the common law right of access to court documents:
>
> It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. . . . American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, . . . and in a newspaper publisher's intention to publish information concerning the operation of government. . . .
>
> It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not used to gratify private spite or promote public scandal through the publication of the painful and sometimes disgusting details of a divorce case.

*Nixon*, 435 U.S. at 597-98 (internal footnotes, quotation marks and citations omitted). This Court must exercise its discretion, "in light of the relevant facts and circumstances of the particular case," in deciding whether a common-law right of access applies to the material in question. *Id.* at 599.

On the other side of the scale, there is a common-law right of privacy in certain types of documents. The fact that the Government made the audio-visual exhibits a part of their trial evidence did not in any way waive or serve to curtail the privacy interests of the Webster family. *Prison Legal News v. Exec. Office for U.S. Attorneys*, 628 F.3d

1243, 1248-49 (10th Cir. 2011). The common law interests of privacy have been discussed in FOIA cases such as *United States Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749, 762-63 (1989) (discussing "both the common law and the literal understandings of privacy"), *National Archives and Records Administration v. Favish*, 541 U.S. 157, 167-169 (2004) (discussing family members privacy interests in autopsy photographs) and *Prison Legal News*, 628 F.3d at 1248-51 (outlining privacy interests by family members in autopsy photographs, video images of relative's body being mutilated and "the voices of the perpetrators themselves describing the heinous acts in progress"). According to *Favish*, "We have little difficulty … in finding in our case law and traditions the right of family members to direct and control disposition of the body of the deceased and to limit attempts to exploit pictures of the deceased family member's remains for public purposes." *Favish*, 541 U.S. at 167. In recognizing the family's common law interest in control over their relative's death images, the Court stated:

> It is the right of privacy of the living which it is sought to enforce here. That right may in some cases be itself violated by improperly interfering with the character or memory of a deceased relative, but it is the right of the living, and not that of the dead, which is recognized. A privilege may be given the surviving relatives of a deceased person to protect his memory, but the privilege exists for the benefit of the living, to protect their feelings, and to prevent a violation of their own rights in the character and memory of the deceased.

*Id.* at 168-69 (internal quotation marks and citations omitted).

*Prison Legal News* addressed a situation even more analogous to the one at hand. There, a video depicting two prisoners mutilating the dead body of another prisoner

whom they had murdered was played in open court at the separate trials of each defendant. *Prison Legal News*, 628 F.3d at 1246. Autopsy photographs depicting the injuries of the victim were also introduced at trial. *Id.* Neither the video nor the autopsy photographs were "under seal" when introduced at trial. *Id.* "At the completion of trial, the photographs and video were returned to the United States Attorneys (*sic*) Office pursuant to a standard order regarding the custody of exhibits." *Id.* Subsequently, Prison Legal News made a request pursuant to FOIA to the Executive Office for U.S. Attorneys, which ultimately released certain portions of the video but withheld the particular portion depicting the mutilation, withheld audio recordings of statements by the mutilators, and withheld autopsy photographs. *Id.* at 1247. The Court held that the privacy interest of the family in the video was "if anything . . . higher than the privacy interest in the photographs at issue in *Favish*" because the video "involve[d a] grotesque and degrading depiction of corpse mutilation . . . as it occurs." *Id.* at 1248. Finally, in both *Favish* and *Prison Legal News*, the courts recognized family member's interest to "secure their own refuge from a sensation-seeking culture for their own peace of mind and tranquility." *Favish*, 541 U.S at 66; *see also Prison Legal News*, 628 F.3d at 1249.

Given this precedent, this Court recognizes that, under the circumstances of this case, the Webster family has a common-law privacy interest in Exhibit 12 (the lapel camera video) because it depicts Officer Webster's words after being shot, his collapse, his desperate movements, his call for help, his audible difficulty breathing, and audible

decent into unconsciousness -- in other words, Officer Webster's process of dying as more eloquently described by his wife in her affidavit.[1]  Mrs. Carlino-Webster states:

> Seeing the audio and video footage from the crime . . . opens the wounds I carry as a result of his alleged murder because I am literally seeing it happen.  Seeing this man who I loved struggle for his life is heartbreaking.  It is too much to bear.  And it does not get any easier to watch. . . . Having to see it again and again is very difficult for me and impedes my ability to heal.

[Doc. 132, pp. 14-15, ¶¶ 10-11]  The Court concludes that these considerations, and the remaining considerations personal to Mrs. Carlino-Webster and Rebecca Ingham (Officer Webster's daughter) are recognized common-law privacy interests.

The Court is not persuaded, however, that Mrs. Carlino-Webster or Ms. Ingham possess the same privacy interest in the Walgreens' parking lot video (Exhibit 13), the video depicting the post-arrest statements of Defendant (Exhibit 42) and the helicopter video depicting Defendant searching for a place to hide (Exhibit 14).  Exhibits 14 and 42 do not depict Officer Webster at all.  Nor are Defendant's statements akin to those in *Prison Legal News*, which were the "the voices of the perpetrators themselves describing the heinous acts in progress."  *Prison Legal News*, 628 F.3d at 1251.  Exhibit 13, the Walgreens' video depicts the scene, fairly dark, from a distance with no audio.  It does not discernibly depict the death or even the struggle for life of Officer Webster.

The Court concludes that these are the common-law interests of the parties and limited intervenors in this case.  The Court now turns to a consideration of the constitutional interests at play in this case.

---

[1] The Court viewed the entirety of the lapel video in preparation for addressing pre-trial motions pending prior to Defendant waiving his right to a jury trial.

**CONSTITUTIONAL INTERESTS**

In our Circuit, *United States v. McVeigh*, 119 F.3d 806 (10th Cir. 1997) sets forth the standards for weighing a criminal defendant's Sixth Amendment interest in sealing court documents against both the common law right of access to court documents and a qualified First Amendment[2] right of access to Court documents, which has been adopted by some Circuits but expressly not adopted by the Tenth Circuit. *Id.* at 812. In *McVeigh*, the District Court sealed certain documents and required the attorneys to keep the sealed documents confidential pending trial. *United States v. McVeigh*, 918 F. Supp. 1452, 1459 (W.D. Ok. 1996). Defendants argued that the Court documents, including evidence which was suppressed, should be sealed due to "the extraordinary nature of the case and the interest in assuring their rights to fair trials." *McVeigh*, 119 F.3d at 809. The Court identified the following five factors, distilled from *Free-Enterprise Company v. Superior Court of California*, 478 U.S. 1 (1986), as controlling the First Amendment inquiry:

> (1) whether the matter involved activity within the tradition of free public access to information concerning criminal prosecutions;
> (2) whether public access might play a significant positive role in the activity and in the functioning of the process;
> (3) whether there was a substantial probability that some recognized interest of higher value than public access to information will be prejudiced or affected adversely by the disclosure;
> (4) whether the need for protection of that interest overrode the qualified First Amendment right of access; and
> (5) whether closure by the court was essential to protect that interest, considering all reasonable alternatives.

---

[2] Though the Tenth Circuit declined to decide whether or not there is a First Amendment right to Court documents, the Court assumed there was and analyzed the issue accordingly. *McVeigh*, 119 F.3d at 812.

*McVeigh*, 119 F.3d at 809, 812-13.  Accordingly, the Court applies these factors to the case at hand.

**Factor 1**

Factor 1 considers "whether the matter involved activity within the tradition of free public access to information concerning criminal prosecutions." *Id.* at 809. The "matter[s]" here are audio-visual exhibits played at the public trial of Count IV. Crucially, unlike in *McVeigh*, the evidence sought here is not evidence excluded, but evidence admitted in Court without limitation or redaction.  *Compare id.* at 813. Traditionally, no protective order is issued to keep exhibits used at a criminal trial confidential, and thus both the press and the public may generally access unsealed evidence introduced and played openly in trial.

**Factor 2**

Factor two deals with whether the public access to the audio-visual exhibits will have a "significant positive role in the functioning of the criminal process." *Id.*; *see also Press-Enterprise Co.*, 478 U.S. at 7 ("[O]ne of the important means of assuring a fair trial is that the process be open to neutral observers.  The right to an open public trial is a shared right of the accused and the public, the common concern being the assurance of fairness."). The controlling fact in *McVeigh*, that the evidence was suppressed, is not present here, and thus the Court cannot reach the conclusion reached in *McVeigh*, which was that the evidence "is simply irrelevant to the process." *McVeigh*, 119 F.3d at 813. The audio-visual exhibits played in Court in the present case were integral to the Government's case at trial, and were viewed in open Court, and thus *McVeigh* recognized

11

a traditional interest in access to the exhibits. Nonetheless, the "significant positive role" that public access to the exhibits here would further is limited: it is the increase in the public's understanding of the function of the criminal process that would be added by disclosure of the audio-visual exhibits, given that they were already played in open court and described in news reports. *See Prison Legal News*, 628 F. 3d at 1251 ("[T]o the extent any additional information can be gained by release of the actual images for replication and public dissemination, the public's interest in that incremental addition of information over what is already known is outweighed by the Estrella family's strong privacy interests in this case.").

**Factors 3, 4 and 5**

Because of their interrelated nature, the Court considers the third, fourth and fifth factors together. The third factor deals with "whether there [is] a substantial probability that some recognized interest of higher value than public access to information will be prejudiced or affected adversely by the disclosure." The fourth factor addresses "whether the need for protection of that interest over[rides] the qualified First Amendment right of access." And the fifth and final factor addresses "whether closure by the court [is] essential to protect that interest, considering all reasonable alternatives." *McVeigh*, 119 F.3d at 809.

Here, the potential "interest of higher value than public access to information," *id.*, is the same as that identified in *McVeigh*: the Defendant's right to an untainted jury and fair trial under the Sixth Amendment. However, as to the fourth and fifth factors, the Court cannot conclude that the Sixth Amendment interest outweighs the qualified First

Amendment right of access because the Court concludes that a protective order as to the exhibits is not "essential to protect" Defendant's Sixth Amendment right to a fair trial, "considering all reasonable alternatives." *Id.*

The court takes judicial notice of the wide and ongoing publicity in various forms of media detailing the descriptions of the audio-visual evidence as well as the fact of the conviction of Defendant for possessing the firearm on or about October 21st.

While the Court recognizes that there may be additional prejudicial consequences in exposing the public to the actual audio-visual images, particular facts have already been widely reported: a description of the audio-visual exhibits and the fact of Defendant's conviction for possessing the firearm. Accordingly, the Court will implement reasonable alternatives which will include, at minimum, the following: this Court will take steps to change the venue of the trial of remaining federal charges, it will summon a larger-than-usual jury pool, it will conduct an extensive *voir dire*, and provide special instructions to the jury, all as may be deemed necessary. In *McVeigh*, these "avenues often available to limit the prejudicial publicity that would arise from disclosure of these materials—such as a venue change, a continuance, extensive voir dire, and admonishments to the jury—had already been exhausted by the time the orders were entered." *McVeigh*, 119 F.3d at 815. Here, however, these avenues have not been exhausted by either this Court or the State Court, and the Court concludes that, as to the charges remaining before it, such avenues will be sufficient to eliminate the potential of a tainted jury.

In sum, weighing Defendant's Sixth Amendment interest in a fair trial against the News Organizations' presumed First Amendment interest in access to the exhibits, the Court concludes that Defendant's Sixth Amendment rights can be adequately protected even if the exhibits are disclosed.

**WEIGHING THE WEBSTER FAMILY'S PRIVACY INTERESTS AGAINST THE PRESS AND PUBLIC'S INTERESTS**

As set forth in *Prison Legal News* and *Favish*, the Webster family has a privacy interest in "with respect to their close relative's death-scene images." *Prison Legal News*, 628 F.3d at 1248 (internal quotation marks and citation omitted); *Favish*, 541 U.S. at 170. With regard to exhibits 14 and 42, the family has no privacy interest because the exhibits do not depict Officer Webster. Exhibit 13 is the Walgreens' security camera footage, but it has no audio, and it only catches the events from a distance. It shows a traffic stop, Officer Webster fleeing and collapsing, and citizens rushing to his aid, but no intimate audio or graphic, gruesome details are discernible. Thus, it is not like the images and audio not disclosed in *Favish* and *Prison Legal News*.

As to Exhibit 12, the Court first addresses the portion played at trial, which is the first minute and 35.846 seconds, which depicts the traffic stop, struggle, and shooting. This portion of the video is dramatic and the shooting is startling. However, it is not extraordinarily gruesome. It does not actually depict the death or struggle for life of Officer Webster. *Prison Legal News* generally recognizes the public's interest in the access to exhibits which help the public to evaluate the administration of justice. *See Prison Legal News*, 628 F.3d at 1247. In this case, that includes the video's depiction of

the functioning of the Albuquerque Police Department and the actions of the motorcyclist. The portion of the video is also useful for understanding the decision of the United States Attorney's Office in choosing to prosecute this case. Finally, and most significantly, this is the portion of the video shown to the fact finder, and demonstrates part of the basis for the Court's ruling.

As to the portion of the video following the shooting, it was not played in open court. It depicts the intimate, final moments of consciousness of Officer Webster, as eloquently described by Mrs. Carlino-Webster. The audio-visual evidence is disturbing, gruesome, and horrific. Any incremental interest that the press and public have in access to this content is negligible, especially because it was not used to reach a decision in this case. It further adds nothing to the understanding of how the incident occurred, the criminal process, or the administration of justice on Count IV.

**CONCLUSION**

What is before this Court is the limited inquiry into whether the Exhibits 12,13,14 and 42, which were played in the trial for Count IV, should remain sealed or otherwise be kept confidential in whole or in part.

After balancing the interests of all concerned here, and in consideration of the unique circumstances in which this matter has been brought to the forefront, the Court cannot conclude that the extraordinary action of issuing a post-adjudication protective order or confidentiality order is warranted as to all exhibits.

The conundrum presented to this Court arises from the fact that the state court entered a protective order sealing the same audio-visual materials which are the subject

of this matter out of concern for the Defendant's right to receive a fair trial in state court. The state court is in the best position to determine whether release of the audio-visual materials will impact Defendant's right to a fair trial in state court. As a practical matter, lifting the seal would negate the protective effect of the state court's order, as it relates to Defendant's right to a fair and impartial jury. Within this action however, this Court lacks the authority to enforce the state court's order against the Government.

Accordingly, to afford the parties and/or limited intervenors the opportunity to seek relief through a reverse FOIA action, or to apply to the state court for relief, this Order will become effective at 12:00 noon on Monday, November 14, 2016.

**WHEREFORE IT IS HEREBY ORDERED** that the Court's October 27, 2016 *Order Sealing Audio Visual Exhibits* is **HEREBY VACATED in part as follows:**

1. The Government's motion is **GRANTED-IN-PART** as to Exhibits 13, 14, 42, and the first 1 minute and 35.846 seconds of Exhibit 12, which are not to remain under seal and as to which no protective or confidentiality order will issue.

2. The Government's motion is **DENIED-IN-PART** as to Exhibit 12 from 1 minute and 35.847 seconds to the end of the video. The Court further **HEREBY ORDERS** that the parties will keep confidential and not disclose the portion of Exhibit 12 from 1 minute, 35.847 seconds to the end of the video.

3. This Order will become effective at 12:00 noon on Monday, November 14, 2016.

**SO ORDERED** this 7th day of November, 2016 in Albuquerque, New Mexico.

_____
M. CHRISTINA ARMIJO
Chief United States District Judge